**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ENTES INDUSTRIAL PLANTS
CONSTRUCTION AND ERECTION
CONTRACTING CO. INC.**,

Petitioner,

v.

**THE KYRGYZ REPUBLIC** and **THE
MINISTRY OF TRANSPORT AND
COMMUNICATIONS OF THE KYRGYZ
REPUBLIC**,

Respondents.

No. 18-cv-2228

**RESPONDENTS' SUPPLEMENTAL BRIEF**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 1

    I.    THE MINISTRY IS ENTITLED TO A PRESUMPTION OF SEPARATENESS ............................................................................ 2

    A.    The Ministry Is an Independent Juridical Entity Under Kyrgyz Law ..................... 3

    B.    Application of the *Bancec* Factors Shows That the Republic Is Entitled to a Presumption of Separateness ................................................................. 7

    II.    THE PRESUMPTION OF SEPARATENESS IS NOT OVERCOME .......... 10

    A.    There Is No Principal-Agent Relationship Between the Ministry and the Republic ................................................................. 10

    B.    There Is No Fraud or Injustice .......................................................... 12

CONCLUSION .................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Crystallex International Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019).........................................................................4

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003)...................................................................................3

*DRC, Inc. v. Republic of Honduras*,
  71 F. Supp. 3d 201 (D.D.C. 2014).....................................1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13

*EM Ltd. v. Rep. of Argentina*,
  473 F.3d 463 (2d Cir. 2007)........................................................................10

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983)...................................................2, 3, 5, 7, 8, 9, 10, 12

*Foremost McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990).................................................................2, 3, 11

*GSS Grp Ltd. v. Nat'l Port Auth.*,
  680 F.3d 805 (D.C. Cir. 2012)....................................................................2, 13

*McKesson Corp. v. Iran*,
  52 F.3d 346 (D.C. Cir. 1995).....................................................................2, 11

*Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018)...............................................................................2, 4, 7

*TMR Energy Ltd v. State Property Fund of Ukraine*,
  411 F.3d 296 (D.C. Cir. 2005)....................................................................2, 12

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000).............................................2, 8, 10, 11, 12, 13

**Statutes**

Civil Code, Articles 85(3), 164(1) ....................................................................6

Civil Code Article 170 ...............................................................................4, 5, 13

Foreign Sovereign Immunities Act ....................................................................1, 3

# TABLE OF AUTHORITIES

**Other Authorities**

Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 COLUM. J. TRANSNAT'L
      L. 327, 364 (2003) .................................................................................................................10

## INTRODUCTION

This dispute began as an effort to confirm a purported $2 billion arbitral award against the Kyrgyz Republic (the "Republic") and the Ministry of Transport and Communications of the Kyrgyz Republic (the "Ministry").  Halfway through the briefing, the dispute narrowed to an effort to confirm an award of just $25 million.  Now, after confirming the award against the Ministry, this Court has requested supplemental briefing on an issue that could—and should—narrow the dispute yet again: "whether the arbitration Award can be confirmed, not just against the Ministry, but against the Kyrgyz Republic as well."  Mem. Op. at 19.

This supplemental brief shows that the answer is obviously no.  As a matter of Kyrgyz law, the Ministry is a separate juridical entity with its own capacity, powers, and obligations.  The Ministry is not responsible for the obligations of the Republic, and the Republic is not responsible for the obligations of the Ministry.  That being the case, adherence to "*Bancec*'s central holding"—namely, "that when a sovereign elects to create an instrumentality with a separate legal personality, its decision normally should be respected"—dictates that the award cannot be confirmed against the Republic.  *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 210 (D.D.C. 2014).  Nothing in the record undercuts that conclusion.  The arbitration agreement underlying the instant award was signed *only* by the Ministry (not the Republic), the Award itself names *only* the Ministry (not the Republic) as Respondent, and at no point did the Republic participate in the arbitral proceedings.  The Republic simply has no place in this confirmation proceeding, and should be dismissed as a foreign state immune from the jurisdiction of U.S. courts under the Foreign Sovereign Immunities Act.

## ARGUMENT

In its Memorandum Opinion of October 17, 2019, this Court affirmed Respondents' view that the separateness of a foreign government instrumentality does not turn on its "core func-

tions," but rather on whether that instrumentality carries "telltale characteristics" of juridical independence as described in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983).  *See* Mem. Op. at 19.  As this Court noted, "[t]he inquiry is not a searching one, and the bar that the Republic must clear in arguing its separateness from the Ministry is low because *Bancec* holds that, for reasons of comity, the lower courts should respect a foreign sovereign's decision to establish an instrumentality with a distinct juridical identity."  *Id*. at 19-20.  This is particularly so where, as here, "the defining characteristic" of independence is present—a statute vesting the Ministry with "a separate juridical identity."  *DRC*, 71 F. Supp. 3d at 210.

Accordingly, the Republic clears the low bar set by *Bancec* and is entitled to a strong presumption of separateness.  As none of the exceptions to that presumption apply, the Republic should be dismissed.

## I.     THE MINISTRY IS ENTITLED TO A PRESUMPTION OF SEPARATENESS

This Court rightly acknowledged that "the starting point for considering vicarious liability between a sovereign and a juridically distinct sub-entity" is the presumption that "government instrumentalities established as . . . distinct and independent from their sovereign should normally be treated as such."  Mem. Op. at 16 (citing *Bancec*, 462 U.S. at 626-27).  This presumption is uniformly recognized in binding case law.  *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018) ("[A]s *a default*, those agencies and instrumentalities of a foreign state were to be considered separate legal entities that cannot be held liable for acts of the foreign state." (emphasis added)); *GSS Grp Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012); *TMR Energy Ltd v. State Property Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000); *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351 (D.C. Cir. 1995); *Foremost McKesson, Inc. v. Iran*,

905 F.2d 438, 446 (D.C. Cir. 1990).   The presumption derives from the Foreign Sovereign Immunities Act and has deep roots in the statute's legislative history.  *Bancec*, 462 U.S. at 627-28; *Foremost McKesson*, 905 F.2d at 446.  Among the justifications for this presumption recognized by the Supreme Court is the need for developing countries to create separate vehicles to attract foreign funding for large infrastructure projects, precisely like the one subject to the arbitration underlying this action.[1]  *See Bancec*, 462 U.S. at 625 ("These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments."); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 485 (2003) (Breyer, J., concurring in part and dissenting in part).

To determine whether this presumption of separateness applies, this Court asked the parties to address certain "'characteristic features of independence' mentioned in *Bancec*," namely:

> Creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies.

Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. 3d at 209).  As detailed below, evaluation of those factors leads to the inescapable conclusion that the Ministry is entitled to the presumption.

## A.    The Ministry Is an Independent Juridical Entity Under Kyrgyz Law

As the Court noted, examination of "whether the Ministry possesses the[] telltale characteristics" of independence requires evaluation of the law of the implicated sovereign.  *Id.* at 20.

---

[1] *See* Dkt. 1-3, ¶¶ 1, 2, 24 (arbitral panel stating that the proceeding arose out of a project for the rehabilitation of the road connecting the two largest cities in the Kyrgyz Republic and funded by a loan from the Overseas Economic Cooperation Fund of Japan).

And here, Kyrgyz law makes it clear that the presumption of separateness applies. Professor Peter Maggs, an expert in the law of the former Soviet republics, including the Kyrgyz Republic, has submitted a declaration on behalf of the Respondents that fully supports this conclusion.

As Professor Maggs states at the outset of his declaration, "It is absolutely clear under the law of the Kyrgyz Republic that the Republic itself and the Ministry are independent in the sense that neither is responsible for the obligations of the other." Exhibit A ¶ 9 (November 18, 2019 Declaration of P. Maggs).[2] This is because the Ministry is a separate "juridical entity" from the Republic, and the country's Civil Code provides that the "state shall not be liable for the obligations of the juridical entities created by it," including obligations to pay debts arising from arbitral awards, unless the Republic had provided a "suretyship" or "guarantee" to do so. *Id.* ¶¶ 9-10 (citing Exhibit D, Civil Code of the Kyrgyz Republic, Art. 170(3)). Entes has raised no allegations about such a guarantee, nor do the contract or arbitral award attached to Entes's Petition suggest otherwise. Dkt. 1-3; Dkt. 1-4. Accordingly, the Republic has no obligation and no proper role in this proceeding.

To reinforce this conclusion, Professor Maggs addressed each of the "telltale characteristics relevant to the separateness analysis" identified by the Court. Mem. Op. at 19.[3]

---

[2] All Exhibits cited herein are attached to the concurrently filed Declaration of Charles T. Kotuby Jr.

[3] The Third Circuit has adopted a slightly different set of the factors outlined by the Supreme Court. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 141 (3d Cir. 2019) (citing *Rubin*, 138 S. Ct. at 822-23). The Third Circuit's test refers to the government's (1) economic control, (2) right to profits, (3) management in daily affairs, (4) right to benefit from the entity's conduct, and (5) avoidance of its obligations in U.S. court. Given that this test has not yet been adopted by the D.C. Circuit and in any event overlaps with those factors set forth in the *DRC* test referred to by this Court, Respondent has not performed a separate analysis using these factors.

*First*, Professor Maggs explains that the Ministry was "[c]reated by an enabling law that prescribes [its] powers and duties." Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. at 209). In particular, the Ministry was created by a governmental resolution "On the Ministry of Transport and Roads of the Kyrgyz Republic," the current version of which is dated August 9, 2016, and identified as law No. 436 (the "Resolution"). Exhibit A ¶ 13; Exhibit E. It contains an Appendix 1 (the "Regulation"), which details the Ministry's prescribed powers and duties "in the sphere of road, rail, air, electric, and water transport." *Id.* ¶ 14 (citing Exhibit F, Regulation § 1(1)). As discussed further below, this enabling law is of critical importance: U.S. courts conducting a *Bancec* analysis often find such a law sufficient in and of itself to attach a presumption of separateness.

*Second*, the Ministry was "established as a separate juridical entity with the capacity to hold property and to sue and be sued." Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. 3d at 209). As noted above, the Ministry is a separate "juridical entity" within the meaning of Article 170 of the Civil Code, and thus may hold property and sue or be sued. Exhibit A ¶ 16 (citing Exhibit D, Civil Code of the Kyrgyz Republic, Art. 83 ("A juridical entity is an organization that has property in ownership, economic management, or operative administration and that is liable for its obligations with this property, and that may, in its own name, acquire and exercise property and personal non-property rights and duties, and may sue and be sued in court.")). This capacity is "not merely theoretical": case law from the Kyrgyz legal system reflects that the Ministry is separately subject to the judicial system and may be sued by private parties. *Id.* ¶ 18 (citing Exhibit G, Ruling of the Appeals Instance of the Bishkek City Court dated November 20, 2013, in Case No. AB-293/13- ED).

*Third*, the Ministry has "a government selected board" or "council."  Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. 3d at 209).  Article 14 of the Regulation provides for an 11-person "council," the composition of which shall be approved by the Prime Minister, but which may include "directors of structural subdivisions and subordinate enterprises" as well as "civil society institutions."  Exhibit A ¶ 19 (citing Exhibit F, Regulation, Art. 14).

*Fourth*, the Ministry has "primary responsibility for its own finances."  Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. 3d at 209).  The Ministry is a juridical entity registered as an "institution" under Kyrgyz law, a designation it shares with religious and charitable organizations as well as universities, museums, and hospitals.  Exhibit A ¶ 22 & n.14 (citing Exhibit D, Civil Code, Arts. 85(3), 164(1)).  "Institutions" are financed in part by the state but may have other sources of income as well—for instance, the loan from the Japanese government that financed the road project at stake in the underlying arbitration.  Exhibit A ¶ 23; Dkt. 1-3, ¶¶ 2, 25.  Critically, the Ministry's finances are independently managed, as demonstrated by budgetary documents.  Exhibit A ¶ 24 (citing Exhibit K, Explanatory Note to the Draft Republic Budget of the Kyrgyz Republic for 2018 and a Forecast for 2019-2020: Ministry of Transport and Roads of the Kyrgyz Republic).  In other words, it obtains general funding and then determines *on its own* how best to use that funding.  *Id.*

*Fifth*, the Ministry "operat[es] as a distinct economic enterprise."  Mem. Op. at 19 (quoting *DRC*, 71 F. Supp. 3d at 209).  The Regulation lists its basic tasks—forming and strategically developing a network of highways, railroads, and air routes in Kyrgyzstan—and Professor

Maggs confirms that the Ministry carries out its operations both by hiring outside contractors and with its own personnel and equipment.  Exhibit A ¶ 26 (citing Exhibit F, Regulation, § 5).[4]

> **B.   Application of the *Bancec* Factors Shows That the Republic Is Entitled to a Presumption of Separateness**

There is "no mechanical formula" for how the foregoing factors should be weighed. *Bancec*, 462 U.S. at 633; *see also Rubin*, 138 S. Ct. at 822.  Courts need not even analyze all factors before finding that a particular entity is entitled to the presumption of separateness.  As noted above, the fact that an instrumentality was established "as a separate juridical entity"—as was the Ministry here—is often enough to warrant the "presumption of separateness."

For example, the court in *DRC* placed great weight on the enabling law at issue, because it endowed the relevant sub-unit of the Honduran government with the essential features of separateness.  *DRC*, 71 F. Supp. 3d at 209-10.  In doing so, it deferred to "*Bancec*'s central holding"—namely, "that when a sovereign elects to create an instrumentality with a separate legal personality, its decision normally should be respected."  *Id.* at 210.  The court in *DRC* repeatedly returned to the status of the entity under the enabling law as  possessing "a separate juridical identity," which it viewed as "the *defining characteristic* of the independent instrumentality."  *Id.* (emphasis added); *see also id.* at 212 (reiterating "the unequivocal statement in FHIS's enabling law establishing its independent juridical identity").

---

[4] This last *DRC* factor also enquires whether the entity is "subject to the same administrative requirements that apply to government agencies."  *DRC*, 71 F. Supp. 3d at 209.  Notably, the *DRC* court discounted the significance of this factor (1) by observing that it is "often" — but not always — the case that separate entities are exempt from administrative requirements and (2) by disregarding the "extensive discussion" of administrative law by the parties in that case as not "particularly helpful," and instead referring back to the enabling statute as the key focal point. *Id.* at 209, 213.

As such, this Court need not even conduct any additional analysis after assessing the Resolution and Regulation establishing the Ministry and detailing its prescribed powers and duties. Exhibit A, ¶¶ 13-14 (citing Exhibits E, F). The Ministry possesses a "distinct juridical identity" under Kyrgyz law, and this Court should respect that determination "for reasons of comity." Mem. Op. at 19.

If, however, the Court deems it necessary to address the remaining factors set forth above, the *DRC* decision provides appropriate guidance. Indeed, that case and this one share some fundamental attributes. The dispute underlying *DRC* also arose out of a construction contract between a private company (DRC) and a "sub-entity" of the Republic of Honduras called the Fondo Hondureño de Inversión Social ("FHIS"). The project, like the one here, was a major infrastructure venture (water and wastewater services) for a developing country funded through foreign sources (the United States Agency for International Development). *DRC*, 71 F. Supp. 3d at 203-04. And there, as here, the foreign sovereign had little to do with the underlying project or the dispute that prompted the U.S. action: Honduras "was not a party to the contract containing the agreement to arbitrate; it was not a participant in the arbitration proceedings; and the arbitral award was not rendered against it." *Id.* at 208.

An award was rendered against FHIS, but DRC filed a confirmation action in U.S. court not against FHIS (the award debtor), but rather against the Republic of Honduras itself. *Id.* at 203. The court concluded that "because the Republic was not itself a party to the arbitration agreement between DRC and FHIS, and as the arbitral award was issued solely against FHIS, a separate and independent entity, this Court lacks jurisdiction to entertain DRC's petition to confirm the award against the Republic." *Id.* at 207. It did so in keeping with the *Bancec* rule that foreign government instrumentalities enjoy a "presumption of separateness" from the sover-

eign—and that there is a "high bar" against disregarding that presumption. *Id.* at 208, 209 (citing *Transamerica Leasing*, 200 F.3d at 849).

When evaluating whether the Republic was entitled to a presumption of separateness, the *DRC* court was not troubled by the fact FHIS, like the Ministry here, had various links to the central government.  For example, "FHIS's Executive Director b[ore] the rank of Minister of State" and was "appointed by the President," who also held "authority to remove the Executive Director." *Id.* at 211-12.  FHIS's enabling law even went so far as to establish "it as an entity . . . of the Presidency of the Republic." *Id.* at 212 (internal quotation marks omitted).  The court nevertheless concluded that "these features do not countervail the legal independence afforded to FHIS by its enabling law, nor the functional independence FHIS has been given to conduct its daily operations." *Id.* at 211; *see also id.* at 212 (noting that though the "state-owned entity in *Bancec* itself also bore some of these same attributes," the "Supreme Court nevertheless began with the presumption that, notwithstanding these features, Cuba's decision to create the institution as a separate juridical entity warranted a strong measure of respect").

Nor was the *DRC* court concerned that FHIS did not enjoy complete financial autonomy from the Republic of Honduras. *Id.* at 211.  For example, the Internal Auditor of the FHIS was appointed directly by the President of Honduras, and answerable to FHIS's governing council, over which the President presided. *Id.* The court was not persuaded "that the government's maintenance of some degree of financial oversight transforms a juridically separate instrumentality into an organ of the state." *Id.* For similar reasons, the court did not find "it consequential that much or even most of FHIS's economic resources [we]re allocated to it by the Republic." *Id.* "Appropriations from a sovereign to its instrumentality constitute a 'normal aspect' of their

relations, 'not an instance of day-to-day involvement in the affairs of the instrumentality.'" *Id.* (citation omitted).

Ultimately, given the similarities between this case and *DRC*, this Court should arrive at the same conclusion as the *DRC* court and find the Republic entitled to a presumption of separateness.

## II.   THE PRESUMPTION OF SEPARATENESS IS NOT OVERCOME

As the Court recognized in its Memorandum Opinion, the presumption of separateness between the Ministry and the Republic may only be overcome in two situations: (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"; and (2) "where recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'" Mem. Op. at 18, 20 (quoting and citing *Bancec*, 462 U.S. at 629; *Transamerica Leasing*, 200 F.3d at 847–48).   That presumption is not easily rebutted. *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 478 (2d Cir. 2007) ("[A] series of prior appellate decisions . . . ha[s] shown a *strong aversion to overriding the presumption of independent status* for separate corporate agencies or instrumentalities." (emphasis added) (quoting Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 COLUM. J. TRANSNAT'L L. 327, 364 (2003)). And here, Entes has not provided the Court with any reason to reject the strong presumption of separateness based on either exception.

### A.   There Is No Principal-Agent Relationship Between the Ministry and the Republic

The D.C. Circuit has provided the controlling articulation of agency law in this context in *Transamerica Leasing*, stating that "the relationship of principal and agent does not obtain unless . . . [(1)] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, *and* [(2)] *the parent exercises its control*" in a sufficiently direct

manner. *Transamerica Leasing*, 200 F.3d at 849 (emphasis added); *DRC*, 71 F. Supp. 3d at 216. The required exercise of control must "amount[] to complete domination of the subsidiary, such that the sovereign and its instrumentality are not meaningfully distinct entities; they act as one." *DRC*, 71 F. Supp. 3d at 215 (quoting *Transamerica Leasing*, 200 F.3d at 848) (internal quotation marks omitted).

Again, the question defies resolution by "mechanical formulae," for the inquiry is inherently fact-specific. *Transamerica Leasing*, 200 F.3d at 849. But there can be little doubt that Entes has not met its burden. *See Foremost McKesson*, 905 F.2d at 447 ("It is further clear that the *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship.") (emphasis added).

As an initial matter, nothing in the Ministry's enabling statute indicates the type of legal subordination necessary to show that it acted as the Republic's agent. *Cf. TMR Energy*, 411 F.3d at 302 (finding the State Property Fund of Ukraine to be an agent of the state where the parliamentary regulation creating the entity stated that in all of its activities it "shall be subordinated and accountable" to the parliament). Nor is there any indication of the sort of "complete domination" needed to show that the Republic and the Ministry "act as one." *DRC*, 71 F. Supp. 3d at 215. Majority ownership or board control are insufficient, in and of themselves, to establish a principal-agent relationship in this context. *Foremost McKesson*, 905 F.2d at 448. And this is particularly so where (as here) the instrumentality "enjoy[s] significant autonomy in the conduct of its daily operations." *DRC*, 71 F. Supp. 3d at 215-16 ("[S]ome level of state control over an instrumentality's governing board does not automatically mean that the sovereign exercises 'complete domination' over the instrumentality."); *see also McKesson Corp.*, 52 F.3d at 352 ("[I]f a government corporation is simply carrying out a state commercial policy as a normal part

of the corporation's mission, without any state involvement, the state should be insulated from the corporation's actions."); *Transamerica Leasing*, 200 F.3d at 853 ("Venezuela did not evince an intent to have CAVN act as its agent in dealing with the plaintiffs. No one at CAVN sought the Government's approval for routine business decisions. In short, *McKesson* is to this case what the *Chicago Manual of Style* was to e.e. cummings: not controlling."). Indeed, even assuming the Ministry could be described as the Republic's agent in some circumstances, "principles of agency" dictate that "a sovereign" is not "amenable to suit upon a contract that its agent made on its own account," as the Ministry did here. *Transamerica Leasing*, 200 F.3d at 850.

None of this should come as a surprise to Entes. As the Award makes clear, the construction contract was between Entes and the Ministry, and nothing about that contractual relationship would have suggested that Entes had a right to bind the Republic as guarantor of the Ministry's contractual payment obligations. Nor does Kyrgyz law assist Entes. As explained by Professor Maggs, the scope of "apparent authority" is very limited in the Kyrgyz Republic, so the creation of principal/agent relationship typically requires a power of attorney, statutory provision, or other governmental act, none of which exists here. Exhibit A, ¶¶ 29-30.

In short, there is no reason to overcome the strong presumption of separateness based on agency principles.

**B.  There Is No Fraud or Injustice**

Grounds for invoking the exception for fraud and injustice may arise where a foreign sovereign intentionally seeks to gain a benefit while using the legally separate status of its instrumentality as a shield to guard against concomitant costs or risks; where a sovereign otherwise unjustly enriches itself through the instrumentality; or where a sovereign uses its instrumentality to defeat a statutory policy. *See Bancec*, 462 U.S. at 630-33; *Transamerica Leasing*, 200 F.3d at 854; *DRC*, 71 F. Supp. 3d at 218. Fraud or injustice may also be apparent where an instrumen-

tality has been cloaked with the apparent authority of the sovereign, and the complaining party reasonably relies upon that manifestation of authority. *Transamerica Leasing*, 200 F.3d at 850; *DRC*, 71 F. Supp. 3d at 218.

None of these factors are relevant to this dispute, nor has Entes even articulated a theory why the Court should rely on "broader equitable principles" to avoid the default rules for separate treatment. *See GSS Grp*, 680 F.3d at 814. Entes never had any reason to believe that it was relying on the wrong counter-party or somehow unjustly enriching the Republic (and for the avoidance of doubt, Respondents would refute any such charges). Entes has known *for 20 years* that it was dealing only with the Ministry—it signed a contract with the Ministry, expected performance from the Ministry, and had the right to arbitrate and collect any resulting damages from the Ministry. Dkt. 1-3, ¶ 1.

Based on the Declaration from Professor Maggs, it is clear that a contractor like Entes that chose to deal with a state-created juridical person, such as the Ministry, should have known based on Article 170 of the Civil Code that the contractor would have no claim against the Kyrgyz Republic for the obligations of the juridical person. Exhibit A, ¶¶ 9-10. Had Entes wanted the state to take on such a responsibility, it could have negotiated (for a price) a state guarantee as contemplated by Article 170. *Id.* Entes failed to do so. This confirmation proceeding is not the proper venue for Entes to reconsider that decision.

In sum, there would be nothing remotely fraudulent or unjust about dismissing the Republic from this matter.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Petition insofar as it seeks a judgment against the Republic.

Dated: November 18, 2019                              Respectfully submitted,


                                                      */s/ Charles T. Kotuby Jr.*

                                                      Charles T. Kotuby Jr. (D.C. Bar #492416)
                                                      David T. Raimer (D.C. Bar #994558)
                                                      Michael P. Daly (D.C. Bar #989670)
                                                      JONES DAY
                                                      51 Louisiana Avenue NW
                                                      Washington, D.C. 20001
                                                      (202) 879-3939

                                                      *Counsel for Respondents The Kyrgyz
                                                      Republic and The Ministry of Transport and
                                                      Communication of the Kyrgyz Republic*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document and related attachments were served on Petitioner's counsel using the Court's CM/ECF system on the 18th day of November, 2019.

 /s/ Charles T. Kotuby Jr.
_____

Charles T. Kotuby Jr. (D.C. Bar #492416)
David T. Raimer (D.C. Bar #994558)
Michael P. Daly (D.C. Bar #989670)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

*Counsel for Respondents The Kyrgyz Republic and The Ministry of Transport and Communication of the Kyrgyz Republic*