**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ENTES INDUSTRIAL PLANTS, | : | |
| CONSTRUCTION AND ERECTION | : | |
| CONTRACTING CO. INC., | : | |
|     Petitioner, | : | Civil Action No.:    18-2228 (RC) |
| | : | |
|     v. | : | Re Documents Nos.:  1, 19 |
| | : | |
| THE KYRGYZ REPUBLIC and THE, | : | |
| MINISTRY OF TRANSPORT AND | : | |
| COMMUNICATIONS OF THE KYRGYZ | : | |
| REPUBLIC | : | |
|     Respondent. | : | |

**<u>MEMORANDUM OPINION</u>**

**C**ONFIRMING THE **P**ETITION AS TO THE **K**YRGYZ **R**EPUBLIC

**I. INTRODUCTION**

This opinion follows and builds upon the Court's October 17, 2019 memorandum

opinion and accompanying order.  ECF Nos. 23, 24; *Entes Indus. Plants Constr. & Erection*

*Contracting Co., Inc. v. Kyrgyz Republic*, No. 18-cv-2228, 2019 WL 5268900 (D.D.C. Oct. 17,

2019).  Petitioner Entes Industrial Plants, Construction and Erection Contracting Co. Inc.,

("Entes"), a Turkish corporation, has filed a Petition to Confirm and Enforce a foreign arbitration

award that it obtained by arbitrating against the Ministry of Transport and Communications of

the Kyrgyz Republic ("the Ministry") in the Kyrgyz Republic ("the Republic").  Pet. to Confirm

and Enforce Foreign Arbitral Award, ECF No. 1.  The Court's earlier opinion explains the

factual background of the dispute, which concerned a construction project Entes undertook in the

Kyrgyz Republic in 2006, as well as the procedural background of the arbitration proceedings,

which took place between 2009 and 2015.  *See Entes*, 2019 WL 5268900 at *1–2.

Respondents the Kyrgyz Republic and the Ministry moved to dismiss the petition, but did not challenge the award or its confirmation on the merits. *See* Mot. to Dismiss Pet. to Confirm Foreign Arbitral Award ("Mot. Dismiss"), ECF No. 19-2.[1]  Instead, they made two procedural arguments.  They argued that the petition ought to be dismissed from this Court on grounds of *forum non conveniens*.  *Id.* at 26.  The Court rejected this argument.  *Entes*, 2019 WL 5268900 at *4–6.  Alternatively, Respondents argued that if the petition was to be confirmed it could only be confirmed against the Ministry and not against the Republic because the Republic was not a party to the arbitration proceedings.  Mot. Dismiss at 21.  Entes asserted that the Respondents were precluded from making this argument, but the Court held that they were not.  *Entes*, 2019 WL 5268900 at *6–8.  The parties disagreed on what precedents and standards the Court ought to apply to determine whether the petition could be enforced against the Republic.  *See id.* at *8. The Court agreed with the Republic that the relevant caselaw began with *First National City Bank v. Banco Para El Comerico Exterior de Cuba* ("*Banec*"), 462 U.S. 611 (1983).  *Entes*, 2019 WL 5268900 at *8–9.  Supplemental briefing was ordered because "[n]either party ha[d] provided the Court with thorough briefing" on how to apply *Banec* and its progeny in this Circuit.  *Id.* at *11.

The award was confirmed against the Ministry, with the question of whether it should also be confirmed against the Republic left open to be resolved following the parties' supplemental briefing.  *Id.*  Having received briefing from both parties, the Court now takes up that question.  The Court concludes that the Ministry is not entitled to a presumption that it is separate from the Republic and that even if it were, that presumption would be overcome

---

[1] The motion did challenge the calculation of the award, and Entes conceded this issue in its opposition.  Pet'r's Opp'n to Resp'ts' Mot. to Dismiss Pet. to Confirm Foreign Arbitral Award at 2, ECF No. 21.

because the Ministry is the Republic's agent.  Because Respondents present no other reasons

why the award should not be confirmed, the Court confirms the award against the Republic.

## II.  ANALYSIS

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, "[t]he district

courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state . . .

with respect to which the foreign state is not entitled to immunity either under sections 1605–

1607 of [the FSIA] or under any applicable international agreement."  Both the Ministry and the

Kyrgyz Republic qualify as a "foreign state" under the language of the FSIA.  *Id.* § 1603(a) ("A

'foreign state' . . . includes a political subdivision of a foreign state or an agency or

instrumentality of a foreign state . . . .").  One of the exceptions to the FSIA grants jurisdiction

over an action "to confirm an award made pursuant to an arbitration agreement governed by an

international treaty."  *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015) (citing 28

U.S.C. § 1605(a)(6) (FSIA exception)).  The Federal Arbitration Act ("FAA") allows "any party

to [an] arbitration" to seek confirmation of the award "against any other party to the arbitration."

9 U.S.C. § 207.  A suit, like this one, brought under the FAA falls within the FSIA exception for

a suit to confirm an award won in arbitration.  *See, e.g.*, *Belize Soc. Dev. Ltd. v. Gov't of Belize*,

794 F.3d 99, 101–02 (D.C. Cir. 2015).  As the Court explained in its earlier opinion, this

exception allows for jurisdiction over this action because the award Entes is seeking to confirm

was made pursuant to such an agreement, The Convention on the Recognition and Enforcement

of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517.

*Entes*, 2019 WL 5268900 at *3.

There is a deferential standard for enforcing an arbitral award in circumstances like these,

and the Respondents raised no argument against confirmation based on the limited grounds for

refusing to enforce an award provided in the New York Convention. *Entes*, 2019 WL 5268900 at *3, *11. There was never any dispute that the Ministry was a party to the arbitration at issue here, but Respondents argue that the Kyrgyz Republic cannot be sued under the FAA—and is therefore not properly joined here—because the Republic was not a party to the arbitration and because the tribunal issued no award against it. The award was confirmed against the Ministry in the Court's prior opinion. *Id.* at *11. Whether the award should also be confirmed against the Republic will depend entirely on whether it can properly be held liable for the actions taken and the money owed by the Ministry.

As explained in the Court's prior opinion, the case that governs whether the award can be confirmed against the Republic or only against the Ministry is *Banec*. That case concerned a trading bank established by Cuba's government in 1954 and later dissolved by that same government. *See Banec*, 462 U.S. 611. The Supreme Court was faced with whether the bank—called Banec—could invoke sovereign immunity to defend against counterclaims based on the Cuban government's actions, or whether it could be sued over those actions as an alter ego of the Cuban government. *Id.* at 613–19. Like this case, the question involved "the attribution of liability among instrumentalities of a foreign state," rather than whether the entity qualified as a "foreign state" under the FSIA. *Id.* at 620 ("The [FSIA] is not intended to affect the substantive law of liability. Nor is it intended to affect . . . the attribution of responsibility between or among entities of a foreign state . . . ." (quoting H.R. Rep. No. 94-1487, at 12 (1976))). *Banec* established that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626–27. This presumption is rebuttable and can be overcome, *id.* at 629–30, but serves as the starting point

when the courts consider vicarious liability between a sovereign and a juridically distinct sub-entity.

There are two stages to the *Banec* analysis in this Circuit.  In the first, the Court must determine whether the respondent "is the sort of entity to which the presumption of separateness applies."  *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 209 (D.D.C. 2014).  Second, the Court must consider whether the presumption is overcome, either because the respondent entity "is so extensively controlled by its owner that a relationship of principal and agent is created" or because "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'"  *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 847–48 (D.C. Cir. 2000); *see also DRC*, 71 F. Supp. 3d at 209 (identifying the same two stages).

### A.  Presumption of Separateness

Generally, courts respect a foreign sovereign's decision to establish an instrumentality with a juridical entity distinct from the sovereign itself.  *Banec*, 462 U.S. at 626 ("[I]gnoring the separate status of government instrumentalities would result in substantial uncertainty . . . .").  To determine whether an entity has been established as a separate instrumentality, courts can look for certain "characteristic features of independence," which include:

> creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies.

*DRC*, 71 F. Supp. 3d at 209 (citing *Banec*, 462 U.S. at 624 (identifying the same "distinctive features")).  The parties have briefed whether the Ministry possesses these characteristics.  *See Entes*, 2019 WL 5268900 at *10–11; *see also* Fed. R. Civ. P. 44.1 ("In determining foreign law,

the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."). Importantly, though, *Banec* does not lay out a formulaic test. Rather *Banec* observes that "[t]he organization and control of [separately constituted legal entities] vary considerably," and identifies only "*characteristic* features" of independence, as *DRC* put it, not *necessary* ones. *Banec*, 462 U.S. at 624; *DRC*, 71 F. Supp. 3d at 209 (emphasis added). While the Court structures its analysis around the characteristics identified in *Banec*, it does not understand these to be the only characteristics that might signal independence or dependence. The Court also does not think the characteristics should be evaluated rigidly or without an appreciation of context—for instance, the Court does not think that an "enabling law that prescribes the instrumentalities powers and duties" counts for much if that establishing law prescribes powers and duties that are strictly controlled by the Government.

As the Court suggested in its prior opinion, determining whether the Ministry is entitled to a presumption of separateness requires looking at the Kyrgyz Republic laws that created it and govern its operation. *Entes*, 2019 WL 5268900 at *10. The Ministry was created by a provision of Kyrgyz law, the current version of which is the Resolution of the Government of the Kyrgyz Republic of August 9, 2016, No. 436, "On the Ministry of Transport and Roads of the Kyrgyz Republic" ("Resolution No. 436"). *See* Decl. by Peter Maggs ("Maggs Decl."), Ex. E, ECF No. 25-6 (respondents' translation); Decl. of Andreas A. Frischknecht ("Frischknecht Decl."), Ex. B., ECF No. 26-3 (petitioner's translation). The Resolution approves an annexed regulation "on the Ministry of Transport and Roads of the Kyrgyz Republic," ("the Regulation"), which has most recently been amended through a Resolution of the Government of the Kyrgyz Republic of December 12, 2016, No. 653 ("Resolution No. 653"). *See* Maggs Decl. ¶ 13; *id.*, Ex. F., ECF

No. 25-7; Frischknecht Decl., Ex. B at 2.  Each party has provided its own translation of excerpts

from these Resolutions.  There are some differences between the translations and the parties did

not choose to excerpt exactly the same sections of the laws.  *Compare* Maggs. Decl. Exs. E, F,

*with*  Frischknecht Decl., Ex. B.

      *Banec* explains that "[a] typical government instrumentality . . . is created by an enabling

statute that prescribes the powers and duties of the instrumentality."  *Banec*, 462 U.S. at 624; *see*

*also DRC* 71 F. Supp. 3d at 209.  The Regulation does this—it provides "General Provisions"

establishing the Ministry, and then details the Ministry's "primary objectives" and "functions,"

as well as the "organization of the work of the Ministry."  Maggs. Decl., Ex. F at 3–4, 8;[2] *see*

*also* Frischknecht Decl., Ex. B at 2–3.  The Respondents argue that the existence of an enabling

law is "of critical importance" and that the court in *DRC, Inc. v. Republic of Honduras* "placed

great weight on the enabling law at issue" even though certain other of the *Banec* factors were

not met.  Resp'ts' Supp. Br. at 5, 7, ECF No. 25.  While it is true that *DRC* placed substantial

weight on the existence of an enabling law, the specific text of that enabling law was what

mattered, not just the fact that there was an enabling law to point to.  In *DRC*, the Fondo

Hondureño de Inversión Social ("FHIS")—the Honduran Social Investment Fund—was created

by a law that defined the FHIS as "an entity *desconcentrada* of the Presidency of the Republic

[of Honduras] . . . having legal personality, its own patrimony and, within the limits of the

present Law, administrative, technical, and financial autonomy."  *DRC*, 71 F.3d at 210 (internal

quotations omitted); *see also id.* at 212–13 (discussing dispute between the parties over whether

*desconcentrada* should be translated as "decentralized" or "nonconcentrated").  This amounted

---

      [2] The exhibits attached to the Maggs declaration do not include page numbers.  As a result, the Court's citations to these documents reference the page numbers generated by the Court's electronic filing system.

to an "unequivocal statement in FHIS's enabling law establishing its independent juridical identity," and it was this statement that the court found so significant. *Id.* at 212. This Court, too, will look at the content of the Ministry's particular enabling law.

The Regulation does not establish the Ministry's juridical independence nearly as clearly as the enabling statute in *DRC* did for the FHIS. It defines the Ministry as "the state executive authority implementing government policy and exercising control" (respondents' translation) or as "a government executive branch agency that implements governmental policy and exerts control" (petitioner's translation) in the area of transportation. Maggs Decl., Ex. F at 3; Frischknecht Decl., Ex. B at 2. In either translation, the Ministry is defined as part of the "state" or "government," not as a separate entity or one *desconcentrada* of the sovereign. The Ministry's activities are said to be "guided by" or "conduct[ed] . . . in accordance with" the Constitution and laws of the Kyrgyz Republic "decrees and directives [or 'orders'] of the President" and "orders of the Government." Maggs Decl., Ex. F at 3; Frischknecht Decl., Ex. B at 2. Further, the Kyrgyz Constitution gives the Government "the right to cancel the acts of Ministries." Frischknecht Decl., Ex. A, Constitution § 5 art. 90 (4).

The ministry is identified as a "juridical entity" or "legal entity," but the laws establishing it make no mention of autonomy (as the laws establishing the FHIS did), and *Banec* focuses more specifically on whether the instrumentality is "a *separate* juridical entity," *Banec*, 462 U.S. at 624. "Juridical entity" is defined in the Republic's civil code as "an organization that has property in ownership, economic management, or operative administration and that is liable for its obligations with this property, and that may, in its own name, acquire and exercise property and personal non-property rights and duties, and may sue or be sued in court." Maggs Decl. ¶ 16 (citing *id.*, Ex. D, Civil Code of the Kyrgyz Republic (May 8, 1996), Art. 83, ECF No. 25-5 at

3).  This definition resolves, in favor of the Ministry's separateness, the second characteristic

identified in *Banec*, whether the entity has "powers to hold and sell property and to sue and be

sued," *Banec*, 462 U.S. at 624, but adds little, if anything, when it comes to the Ministry's

autonomy or degree of separation from the state.

The Ministry lacks the third characteristic identified in *Banec*, which focuses on whether

the instrumentality is "managed by a board selected by the government," *Banec*, 462 U.S. at 624.

Both parties point to Article 14 of the Regulation on this issue.  Maggs Decl. ¶ 19 (citing *id.* Ex.

F § 14); Pet'r's Supp. Br. at 17 (citing Frischknecht Decl., Ex. B. § 14).  Their translations differ

in small ways, but by either account Article 14 establishes that an 11-member council including

the Minister, Secretary of State, and Deputy Ministers—"by virtue of their office [or

'positions']"—along with other members "approved by the Prime Minister of the Kyrgyz

Republic" based on recommendations from the Minister.  Maggs Decl., Ex. F. § 14; Frischknecht

Decl., Ex. B. § 14.  Respondents point to the existence of the board in their briefing, but they

ignore the important fact, emphasized by Entes, that the leadership of the board are also

members of the Government.  *See* Resp'ts' Supp. Br. at 6; Pet'r's Supp. Br. at 17 (citing

Frischknecht Decl., Ex. A ("The Government consists of the Prime Minister, Deputy Prime

Ministers, Ministers, and Chairmen of State Committees.")); *see also Banec*, 462 U.S. at 618 n.5

(quoting the district court in *Banec* as observing that "[t]he [Cuban] Ministry of Foreign Trade is

no different than the Government of which its minister is a member" (citation omitted)).  This

hardly suggests "independence from close political control."  *Banec*, 462 U.S. at 624.  Rather, it

resembles the structure of FHIS's leadership, which counted against that entity's independence.

*See DRC*, 71 F. Supp. 3d at 211–12 (noting that "the President of [Honduras] presides over

FHIS's Supreme Council of Administrators," that "[t]he Council also includes among its

membership the President of the National Congress and three Ministers of State," and that "FHIS's Executive Director bears the rank of Minister of State"). It is clear, though, that these factors are not determinative, because "[t]he state-owned entity in *Banec* itself also bore some of these attributes," and was nonetheless entitled to a presumption of separateness. *Id.* at 212 (citing *Banec*, 462 U.S. at 613–14).

The Regulation also touches on *Banec*'s fourth characteristic—whether the Ministry "is primarily responsible for its own finances." *Banec*, 462 U.S. at 624. The Ministry receives "[f]unding . . . provided from the Republic's budget and other sources of funding not contrary to the legislation of the Kyrgyz Republic." Frischknecht Decl., Ex. B at 2; *see also* Maggs Decl., Ex. F at 4 (reflecting negligible differences in translation). It is further empowered to "perform the functions of the chief controller and recipient of funds from the Republic's budget and other sources as provided." Maggs Decl., Ex. F. ¶ 8. Although "other sources of funding" are theoretically available to the Ministry, the emphasis in the Regulation is on the Government's provision of funds and budgetary control as well as on the limits established by the Republic's laws. There is no suggestion that the Ministry raises funds on its own, and Respondents' do not suggest as much. *See* Resp'ts' Supp. Br. at 6.[3]

---

[3] Respondents also point to Article 170 of the Civil Code of the Kyrgyz Republic, which states that "[t]he state shall not be liable for the obligations of the juridical entities created by it," subject to certain exceptions. Maggs Decl. ¶ 9 (citing *id.*, Ex. D, Art. 170(3)). The Court finds Article 170 is unhelpful in this evaluation, as relying on it here would require assuming the answer to the separateness question. Entes observes that subsection 3 only applies to juridical entities *created by* the state, not to those that are part of the state itself. Pet.'s Supp. Br. at 15 n.5. Additionally, Article 170 states that the state is not liable for obligations regarding "property that is attached to juridical entities created by [the state] on the basis of the right of economic management or operative administration." Maggs Decl., Ex. D, Art. 170(1). Article 170 thus explains what to do with obligations relating to entities created by the state or to entities entitled to "economic management or operative administration," but does not help in evaluating whether the Ministry is such an entity.

On the subject of finances, a comparison between the Ministry and the FHIS yields mixed results.  In *DRC*, the fact that "much or even most of FHIS's economic resources [were] allocated to it by the Republic [of Honduras]" was not "consequential" because this alone did not indicate "'day-to-day' involvement in the affairs of the [instrumentality]."  71 F. Supp. 3d at 211 (quoting *Transamerica*, 200 F.3d at 852).  Respondents here attempt a similar argument, asserting that the Ministry's budget is "independently managed," pointing to budget documents showing that the Ministry controls its own spending on "everyday operations."  Maggs Decl. ¶ 24 (citing *id.*, Ex. K, ECF No. 25-12).  Entes attempts to show the opposite, pointing to a letter it received from the Deputy Minister of Transportation seeking to delay discussions between Entes and the Ministry concerning the arbitration award "due to the fact that the Ministry of Finance of the Kyrgyz Republic is preparing information on possibilities of the budget of the Kyrgyz Republic."  Pet'r's Br. at 16 (citing Declaration of Ahmet Alp ("Alp Decl."), Ex. I, ECF No. 26-15).  In the Court's view, the Ministry's dependency on Government decisionmakers for significant financial matters like the settlement of this dispute reveals more about the nature of the relationship than does the Ministry's control over day-to-day decisionmaking.  Overall as well, the Ministry appears less designed for financial independence than the FHIS was.  The statute establishing the FHIS guaranteed its "financial autonomy," and said it could "negotiate and contract for various forms of financing with both national and international entities," and had "ownership of its assets."  *DRC*, 71 F. Supp. 3d at 210–11.  The Ministry could certainly hold assets and make contracts, like the one it made with Entes, but its enabling statute does not emphasize financial autonomy nearly so much.

The Ministry also fares poorly on the fifth *Banec* characteristic for these same reasons.  It is not a "distinct economic enterprise" and is, in fact, "subject to the same budgetary and

personnel requirements with which government agencies must comply." *Banec* 462 U.S. at 624; *see also DRC*, 71 F. Supp. 3d at 209 (rephrasing this characteristic slightly to focus on the "same administrative requirements"). As quoted above, the Ministry is able to draw on outside sources of funds only to the extent that doing so is "not at odds with the laws of the Kyrgyz Republic." Maggs Decl., Ex. F at 4. The same can be said of "personnel requirements," as the Regulation establishes that the Minister "shall . . . *pursuant to the procedure established by law*, appoint and dismiss the Ministry's civil servants." Maggs Decl., Ex. F ¶ 13 (emphasis added). Respondents do not point to any provision of Kyrgyz law applying atypical requirements to the Ministry. *See* Resp'ts' Supp. Br. at 6–7 (discussing the fifth characteristic).

Overall, this does not give the impression of a "separately constituted juridical entit[y]" with "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." *Banec*, 462 U.S. at 623, 624–25. Of the five characteristics identified in *Banec*, the Ministry possesses only one firmly, and two others weakly at best. It can hold property, sue, and be sued. It is also created by an enabling law, though not by one that emphasizes the Ministry's independence or autonomy. It has some responsibility for its own finances, but not necessarily "primary responsibility." Weighing against these characteristics are some strong indications that it is part of the state—the Ministry is run by members of the Government, the Government controls its funding, and the Government can cancel its actions. None of these considerations alone is determinative, but overall they do not suggest that the Kyrgyz Republic intended, in creating the Ministry, to "establish [a] separate juridical entit[y] as [a] vehicle[] through which to obtain the financial resources needed to make large-scale national investments." *Id.* at 625. As a result, the Ministry is not entitled to the presumption that it is separate from the sovereign, the Kyrgyz Republic.

### B. Agency Relationship

The conclusion that the Ministry is not entitled to a presumption of separateness is enough basis for the Court to resolve this petition in Entes's favor and to confirm the award against the Republic.  Even if the Court were to hold otherwise, though, and were to afford the Ministry a presumption of separateness, that presumption would be overcome here by the agency relationship between the Republic and the Ministry.  *See Banec*, 462 U.S. at 629–30.  Where the sovereign exercises control in such a way as to make a separate instrumentality its agent, the sovereign can be amenable to suit under ordinary agency principles.  *Id.*; *see also Transamerica*, 200 F.3d at 848; *DRC*, 71 F. Supp. 3d at 214.

The *Banec* exception inquiry, like all evaluations of agency relationships, is inherently fact-specific and defies mechanical formulation.  *Transamerica*, 200 F.3d at 849 (citing *Banec*, 462 U.S. at 633).  Control—in forms like majority share ownership or the appointment of an entity's directors—is a strong indication of a principal-agent relationship, even if control alone is insufficient to establish an agency relationship.  *See id.* at 848–49 (citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448 (D.C. Cir. 1990)).  At the same time, a sovereign does not need to exercise complete dominion over an instrumentality in order to stand in an agency relationship with it.  *Id.* at 849.  At the very least, a principal-agent relationship is not established unless: (1) the principal has "manifested its desire for the subsidiary to act" on its behalf; (2) the agent has consented to act on the principal's behalf; (3) the principal has the "right to exercise control" over the agent "with respect to matters entrusted to" the agent; and (4) the principal exercises its control more directly than simply "by voting a majority of the stock" in the agent or appointing members to the agent's Board of Directors.  *Id.*

Here, Entes argues that each these of factors establishing an agency relationship is present and that they demonstrate that any presumption of separateness here should be overcome by the fact that the Ministry has "consistently acted as a mere agent of the Republic in its dealings with Entes." Pet'r's Supp. Br. at 3; *id.* at 18–24. Respondents contend that there is no agency relationship because the Republic has not exercised "sufficiently direct" control over the Ministry. Resp'ts' Supp. Br. at 10; *id.* at 10–12. For the foregoing reasons, the Petitioner has the better argument.

First, the Republic has manifested a desire for the Ministry to act on its behalf. *See Transamerica*, 200 F.3d at 849. The Kyrgyz Republic's Constitution, as translated by the Petitioner, strongly suggests that the Ministry will act on the Government's behalf because it makes clear that the power exercised by the Ministry is the executive power of the Republic itself. *See* Frischknecht Decl., Ex. A, § 5 art. 83 (1) ("The executive power in the Kyrgyz Republic is exercised by the Government [and] its subordinate ministries . . . ."). Resolution No. 653 makes the Republic's manifest desire even more clear. Maggs Decl., Ex. F.; Frischknecht Decl., Ex. B. The Respondents' translation presents this regulation as having been "[a]pproved by Resolution of the Government of the Kyrgyz Republic"—which is to say approved by the Republic itself. Maggs Decl., Ex. F at 3. "In its activities," this Regulation says, "the Ministry shall be guided by" among other things "the laws of the Kyrgyz Republic, the decrees and directives of the President of the Kyrgyz Republic, [and] the resolutions and orders of the Government of the Kyrgyz Republic." *Id.* In approving this resolution, then, the Republic manifested that its resolutions, orders, decrees, and directives would guide the Ministry. Resolution No. 653 further indicates that the Ministry will have a variety of rights—including receiving funds, soliciting bids, hiring, and setting up commissions—all "[f]or the purposes of

implementing the objectives and functions entrusted to it." *Id.* at 7 ("Rights of the Ministry").

Here, again, the Republic manifested its desire for the Ministry to act on its behalf by indicating

that it would be entrusting certain functions to the Ministry.  These examples reveal that the

Republic has communicated an intention that the Ministry act on its behalf.

Second, Entes has also put forward evidence suggesting that the Ministry has consented

to act on behalf of the Republic.  *See Transamerica*, 200 F.3d at 849–50.  In the course of the

construction project at issue here, the Ministry evinced such consent by explaining to Entes that

it was in fact acting on behalf of the Republic.  Entes points to a Statement of Performance it

received which was signed by the Ministry of Transportation and by the Ministry of Finance,

indicating that the two ministries were "representing the Government of the Kyrgyz Republic" in

their communications with Entes.  Alp Decl., Ex. F, ECF No. 26-12 at 5; *see also* Alp. Decl.

¶¶ 18–20, ECF No. 26-6.  The Statement of Performance also explains that the Republic was co-

financing the construction project.  Alp Decl., Ex. F, ECF No. 26-12 at 5.  The Ministry's efforts

to complete a construction project that was co-financed by the Republic and which would bring

obvious benefits to the Republic also suggests the Ministry's consent to act on the Republic's

behalf.  Further, it bears mentioning that the close control established through Resolution No.

653 calls into question whether the Ministry even has the legal capacity to act otherwise than on

behalf of the Republic.

Third, the Republic has the right to exercise control over the Ministry with respect to

matters that are entrusted to the Ministry.  *See Transamerica*, 200 F.3d at 849.  Again,

Resolution No. 653 more or less establishes as much.  Maggs Decl., Ex. F at 3 ("In its activities,

the Ministry shall be guided by the Constitution . . . the laws of the Kyrgyz Republic . . . [and]

the resolution and orders of the Government of the Kyrgyz Republic").  Moreover, Article 90 of

the Kyrgyz Constitution—translated for the Court only by the Petitioner—outlines the

Government's Executive Power, noting that "[t]he Government manages Ministries, State

Committees, Administrative Departments, [and] Local Public Administrations" and that the

Government also "has the right to cancel the acts of Ministries . . . [and] Administrative

Departments."  Frischknecht Decl., Ex. A, § 5 art. 90 (3), (4).  This kind of constitutionalized

authority over the Ministry meets the threshold established in *Transamerica*.  *See Transamerica*,

200 F.3d at 849 (citing Restatement (Second) of Agency § 1).  Resolution No. 653 incorporates

this constitutional provision by establishing that "the Ministry shall be guided by the

Constitution of the Kyrgyz Republic," Maggs Decl., Ex. F at 3, or, in Petitioner's translation, that

"[t]he Ministry conducts its activities in accordance with the Constitution," Frischknecht Decl.,

Ex. B at 2.

Further, the Republic has the right to exercise control over individuals carrying out the

Ministry's work.  Respondents hardly address powers of appointment and removal in their

supplemental briefing, though in their first round of briefing they did concede that the Minister

of Transport and Roads is appointed by the President of the Republic.  Mem. of Law in Supp. of

Resp'ts' Mot. to Dismiss Pet. at 24, ECF No. 19-2.  In fact, the Government's involvement in

staffing the Ministry appears considerably more extensive.  The Minister of Transport is "to be

appointed and dismissed by the President of the Kyrgyz Republic upon the recommendations of

the Prime Minister."  Maggs Decl., Ex. F at 8.  Deputy Ministers are appointed and dismissed by

the Prime Minister, and "report directly to the Minister."  *Id.*  "The council of the Ministry,"

which "shall consider the most important issues of the Ministry's activities" is made up of eleven

members, including the Minister and Deputy Ministers, all of whom "shall be approved by the

Prime Minister of the Kyrgyz Republic," and "[t]he council must include a representative of the

Office of the Government of the Kyrgyz Republic." *Id.* at 9.  The Republic's Government thus

has the right to exercise significant control over the Ministry by means of shaping its leadership.

Finally, as is clear by now, the Republic exercises control in a manner more direct than

merely appointing a majority of a board's members.  *See Transamerica*, 200 F.3d at 849 ("[T]he

parent [must] exercise[] its control in a manner more direct than by . . . making

appointments . . . ."); *see also Foremost-McKesson*, 905 F.2d at 448.  Members of the

Government are guaranteed leadership positions on the board.  *See* Frischknecht Decl., Ex. A § 5

art. 83 (3) ("The Government consists of the Prime Minister, Deputy Prime Ministers, Ministers,

and Chairmen of State Committees.").  The fact that Ministry leadership holds these dual roles

was discussed above as one indication that the Ministry should not be entitled to a presumption

of separateness in the first place but, if such a presumption is to be applied, the dual roles must

again be considered, in the agency law analysis, as a form of control by the Republic.  Further,

the Government's ability to entrust functions to the Ministry, *see* Maggs Decl., Ex. F at 7, and to

cancel the Ministry's acts, *see* Frischknecht Decl., Ex. A, § 5 art. 90 (4), are further indications

that its control is more direct than what could be achieved merely through appointments.

Moreover, Entes describes a number of issues that arose during the course of its business

with the Ministry that the Ministry could not independently resolve.  For example, the Ministry

was unable to independently hire counsel without "officially coordinat[ing]" with the

Government in "observance of certain procedures."  Declaration of Professor Dr. Zayi Akinci

("Akinci Decl.")  ¶ 13, ECF No. 26-16.  Additionally, the Republic seems to decide whether and

how the Ministry complies with its payment obligations.  After the judgment of Arbitration

Court in September 2015, the Republic established a working group in order to discuss the

"possibilities of the budget of the Kyrgyz Republic" in regard to the award.  Alp Decl., Ex. I at

2[4], ECF No. 26-15.  This is further evidence of the Republic's control over the Ministry's actions, and shows that there exists a principal-agent relationship between the Ministry and the Republic that would make the Republic amenable to suit in this case, even if the Court were to assume that the two entities were separate.

The Republic argues that Entes has failed to establish an agency relationship because an agency relationship requires the "complete domination of the subsidiary, such that the sovereign and its instrumentality are not meaningfully distinct entities."  Resp'ts' Supp. Br. at 11 (quoting *DRC* 71 F. Supp. 3d at 215 (quoting *Transamerica*, 200 F.3d at 848)).  But no such rule is established by either of the cited cases.  *DRC* states quite clearly that "this [*Banec*] exception may rest either on complete domination or ordinary agency principles."  *DRC*, 71 F. Supp. 3d at 217.  *Transamerica* likewise notes that "a sovereign need not exercise complete dominion over an instrumentality" to be amenable to suit based on the instrumentality's actions because if that were required "the sovereign would be subject to suit on the ground that [the two] were in fact a single entity" and the *Banec* agency exception would never be needed.  *Transamerica*, 200 F.3d at 849.  Control that does not amount to "complete domination" may nonetheless be relevant to the *Banec* exception analysis if it "significantly exceeds the normal supervisory control," and serves to show an agency relationship.  *Id.* at 848.

The Republic also argues that the Court must look at the narrow construction of agency law in the Kyrgyz Republic.  Resp'ts' Supp. Brief. at 12 (citing Maggs Decl. ¶¶ 29, 30).  The Republic claims that the scope of "apparent authority" is very limited under Kyrgyz law, that in that country a principal-agent relationship typically requires "a power of attorney, statutory

---

[4] Some exhibits attached to the Alp declaration, including Exhibit I, do not include page numbers.  As a result, the Court's citations to these documents reference the page numbers generated by the Court's electronic filing system.

provision, or other governmental act," and that "none of [those] exist here." *Id.* at 12 (citing

Maggs Decl. ¶¶ 29, 30). However, the Republic does not cite any authority establishing that the

Republic's agency law should apply instead of this country's and this Circuit's. Decisions in this

Circuit have not looked to any foreign sovereign's agency law when evaluating whether any

foreign sovereign's instrumentality was also its agent. *See, e.g.*, *TMR Energy Ltd. v. State*

*Property Fund of Ukraine*, 411 F.3d 296, 301–02 (D.C. Cir. 2005); *Transamerica*, 200 F.3d at

849. For example, in *Transamerica*, the Court noted that control is relevant where the sovereign

functionally makes an instrumentality its agent. *Transamerica*, 200 F.3d at 849. In that case, the

Court explained that control renders the sovereign amenable to suit based on "ordinary agency

principles," and did not cite to or discuss the laws of Venezuela in defining those ordinary

principles. *Id.* (citing *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 n. 16, 1029

(D.C.Cir.1982)); *see also* Restatement (Second) of Agency §§ 1, 14, 14M (1958). Similarly, in

*TMR*, in deciding whether an instrumentality was an "agent" of the sovereign for purposes of the

Due Process Clause, the Court focused on the same type of "sufficient control" analysis as in

*Transamerica*, rather than analyzing whether the agency laws of Ukraine would establish a

principal-agent relationship between the agency and the Ukrainian government. 411 F.3d at

301–02. *DRC* made no reference to the Honduran agency law when it considered whether this

exception applied. *See DRC*, 71 F. Supp. 3d at 214–17. And neither did *Banec* reference Cuban

agency law when it established this exception. *See Banec*, 462 U.S. at 629. Foreign law plays a

role in the analysis, as it has here, but only insofar as it illuminates the set of relationships to

which the agency law of the United States can be applied. Applying those "ordinary agency

principles" here, *Transamerica*, 200 F.3d at 849, the Court finds a principal-agent relationship

between the Republic and the Ministry that is sufficient to overcome any presumption of separateness that might have been applied.

### C.  Confirmation of the Award

Having concluded that the Republic is amenable to suit based on the actions of the Ministry for two separate reasons, this leaves only the issue of confirmation of the award. Because the Republic is liable for the Ministry's actions, this proceeding is one against a foreign state, and the Court returns to the FSIA and, for the sake of clarity, will retread some ground covered in the Court's October Memorandum Opinion.

Jurisdiction over actions against foreign states is limited to the enumerated exceptions to immunity in the FSIA.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Because of this limitation, a court must "satisfy itself that one of the exceptions applies" at "the threshold of every action in a District Court against a foreign state."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983).  Here, the arbitration exception in § 1605(a)(6) applies.  Section 1605(a)(6) grants jurisdiction over actions "to confirm an award made pursuant to an arbitration agreement governed by an international treaty."  *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203 (D.C. Cir. 2015).  For an action to qualify for this exception, the petitioner must show that "(1) a foreign state has agreed to arbitrate; (2) there is an award based on that agreement; and (3) the award is governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards."  *Id.* at 204 (calling these "the relevant jurisdictional facts") (internal quotation marks and citations omitted).

In this action, Entes seeks to confirm an award made pursuant to its contract with the Ministry and governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517.  *See also* 9

U.S.C. §§ 201 *et seq.* (implementing the treaty through amendments to the Federal Arbitration Act). Entes has produced a contract containing an arbitration agreement between itself and the Ministry, ECF No. 1-4, which is a "foreign state" for purposes of the FSIA. Entes has also produced the Award against the Ministry that it obtained as the result of arbitration proceedings that took place pursuant to the agreement to arbitrate in the contract. The New York Convention, by its terms, governs the Award, as it is an "award made in the territory of a State [the Kyrgyz Republic] other than the state [the United States] where the recognition and enforcement . . . are sought."[5] New York Convention art. I; *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999). This Court therefore has jurisdiction over an action to enforce the award under § 1605(a)(6).

In general, courts apply a deferential standard when reviewing arbitral awards. "Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). This deferential standard is akin to the deferential standard used when reviewing domestic arbitral awards. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568–69 (2013) ("Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.' . . . If parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" (first quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995), then quoting *Hall St. Assocs.,*

---

[5] Although neither the Award nor the contract specifically mentions the New York Convention, Respondents have never suggested that it does not govern.

*L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008))).  The Supreme Court has described the deferential standard as allowing vacatur of an award not if "the panel committed an error—or even a serious error" but "only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010) (internal quotation marks and citations omitted).  Similarly, the D.C. Circuit has held that "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of [her] authority, that a court is convinced [she] committed serious error does not suffice to overturn [her] decision." *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (D.C. Cir. 1991) (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

In a proceeding to confirm a foreign award under the New York Convention, the district court is even more constrained and "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (internal quotation omitted); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("Confirmation proceedings are generally summary in nature" because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award." (citing *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007))).  The Court found that confirmation of the award against the Ministry was appropriate because Respondents did not "make any argument based on the reasons for refusing confirmation identified in the New York Convention." *Entes*, 2019 WL 5268900 at *11.  The Respondents make no such argument with regard to the Republic either, focusing entirely on the *Banec* issues at this stage.  Having rejected Respondents' arguments on that front, the Court will confirm the award against the Republic.

### III.  CONCLUSION

For the foregoing reasons, Entes's Petition to Confirm and Enforce Foreign Arbitral Award, ECF No. 1 is GRANTED as to the Kyrgyz Republic.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 22, 2020

RUDOLPH CONTRERAS
United States District Judge
